UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRITTNEY NEAL,** | : | **CASE NO.: 3:21-CV-00497-SALM** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **SPECIALTY CABLE CORP.,** | : | |
| Defendant. | : | **MAY 2, 2022** |
| | : | |

**DEFENDANT SPECIALTY CABLE CORP.'S REPLY TO PLAINTIFF'S OBJECTION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I. Plaintiff's Speech Was Not Constitutionally Protected. ............................................................ 1

    A.    2019 Audit ................................................................................................................... 1

    B.    Testing Stock Product ................................................................................................ 2

    C.    Plaintiff's February 5, 2021 Meeting With Jodi McCall ................................................ 3

II. SCC Did Not Violate Any Important And Clearly Articulated Public Policy. ....................... 4

III. Plaintiff Is Not Otherwise Without A Remedy. ...................................................................... 5

IV. Plaintiff Was Terminated Because Of Her Disrespectful And Insubordinate Behavior. ........ 6

V. Plaintiff Cannot Provide Any Evidence That SCC's Legitimate Nonretaliatory Reason For Terminating Her Employment Was Pretextual. ............................................................................. 6

    A.    Plaintiff's Cellphone Use And November 25, 2020 Incident. ....................................... 8

    B.    FLSA Retaliation Claim ............................................................................................ 10

VI. Conclusion ............................................................................................................................. 10

In accordance with the provisions of Local Rule 7(d), Defendant Specialty Cable Corporation ("SCC") submits the following Reply to Plaintiff's Objection to Defendant's Motion for Summary Judgment (Doc. 65) ("Plaintiff's Opposition").

SCC terminated Plaintiff's employment on March 3, 2021, for her disrespectful and insubordinate behavior toward her supervisor during a department meeting, which occurred when she was at the last step in the progressive discipline process and had just recently been suspended for two other instances of insubordinate and disrespectful behavior to two separate managers. Any complaints Plaintiff may have made throughout her employment at SCC were wholly unrelated to her supervisor's decision to terminate her employment.

## I. **Plaintiff's Speech Was Not Constitutionally Protected.**

Plaintiff argues that her speech was constitutionally protected and that SCC's own witness testimony directly disputes its argument that Plaintiff's concerns as to failed quality testing are not a matter of public concern because no failed products were ever shipped. Doc. 65-2, p. 11. Plaintiff's Opposition misstates the facts and focuses on facts that are immaterial and irrelevant to her employment and employment termination.

### A. **2019 Audit**

Plaintiff focuses on Schroeder's deposition testimony about an audit SCC underwent in 2019, prior to both Schroeder's and Plaintiff's employment at SCC.[1] The 2019 audit is irrelevant for several reasons. It precedes Plaintiff's 2020 commencement of employment and SCC's conduct prior to Plaintiff beginning work at SCC is unrelated to her employment. The audit

---

[1] Plaintiff points to Schroeder's deposition testimony, when he states that the allegations in the 2019 audit were that SCC made up false testing reports and shipped products without being testing. Doc. 65-6, 72:2–16. This testimony is inadmissible hearsay, not the best evidence, and irrelevant to Plaintiff's employment and McCall's decision to terminate Plaintiff's employment. *See* Fed. R. Evid. 801 and 1002. Further, Schroeder was not employed at SCC at the time of the 2019 audit and is not competent to testify as to what happened during the audit.

concerned the frequency at which SCC was testing one of its product lines prior to 2019, thus it is irrelevant to the quality testing performed and the products shipped during Plaintiff's employment. *See* Affidavit of Kim Bowen ("Bowen Aff."), ¶ 7.[2]  Plaintiff's speech as to SCC's conduct prior to the 2019 audit (if any) was not a matter of public concern because no products that failed quality testing or had not been tested were shipped to customers during her employment. *Id.*, at ¶ 11. And, importantly, Plaintiff never complained to any member of SCC management that failed or untested products were being shipped to customers during her employment. Doc. 59-5, ¶ 7; Doc. 59-34, 55:14–56:1; Doc. 59-6, ¶ 6; Doc. 59-31, 112:3–6; Doc. 59-3, ¶ 7; Doc. 59-33, 33:4–8.

**B.      Testing Stock Product**

Plaintiff also focuses on the allegation that when she was testing stock product, she found a failed product that had previously been shipped. Doc. 65-2, p. 11. Plaintiff asserts "Schroeder admitted that Plaintiff was conducting quality tests on product that had already shipped for which there was no testing data." Doc. 65-2, p. 11. Although SCC could not find test data, the stock products were in fact previously tested. *See* Doc. 59-30, 25:23–24. Schroeder testified the test data was "not easily found, easily searched through, so it made more sense to just retest than it did to try to find the papers . . . ." *Id.,* 26:1–5. Further, just because the product failed when Plaintiff tested it, does not mean it failed when it was originally tested years prior because many things can

---

[2] While what occurred during the 2019 audit is not relevant or material to the present action, it should be noted that Plaintiff misrepresents the nature of the 2019 audit. The United States Department of Defense maintains a Qualified Products List ("QPL") of products and manufacturers that have been formally evaluated and found to be compliant with the applicable specifications. Affidavit of Kim Bowen ("Bowen Aff."), ¶ 5. In 2019, SCC underwent an audit performed by the Defense Logistics Agency and as a result, its QPL certification for one of its product lines was discontinued because the auditor found that SCC was not testing the product at the frequency required to be included on the QPL. *Id.*, at ¶¶ 6-7. SCC never falsified any test data or shipped products that failed QPL testing. *Id.*, at ¶ 11. SCC is not aware of any quality issues, any failures in the field or any complaints by customers about the quality or integrity of the product line that was the subject of the QPL audit. *Id.,* at ¶¶ 9–10. Since SCC lost its QPL certification, it has been working to regain the certification. *Id.*, at ¶ 8. For example, in 2020, SCC hired Plaintiff and three other Quality Assurance Technicians to provide the high frequency of testing required to be QPL certified. *Id.* Since the audit, SCC has made the necessary improvements to the frequency of testing required to be QPL certified.

happen to the stored wire over time that may lead to a failed test.  Doc. 59-5, ¶ 11.  Plaintiff does not know whether the product at issue during this alleged incident was sent with a certification that it passed all required tests.  Ex. A, Deposition of Plaintiff ("Plaintiff Dep."), 195:9–14.  Plaintiff's claims are mere speculation and conjecture, which cannot defeat a motion for summary judgment.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

Plaintiff also speculates as to what the phrase "[i]t's too much paperwork," supposedly said by Production Floor Supervisor, Ivan Ramos ("Ramos"), meant.  She claims that when she purportedly informed Schroeder about a testing failure on previously shipped stock product and Schroeder asked Ramos what to do, Ramos responded, "it's too much paperwork."  Ex. A, Plaintiff Dep., 199:24–200:1.  Whether this was said is not an issue of material fact[3] because Plaintiff lacks the information to link the statement to a public policy concern.  She does not know whether the product passed quality testing and was shipped with a certification when it was previously sent to the customer three years prior.  *Id.*, 195:1–14.

### C. Plaintiff's February 5, 2021 Meeting With Jodi McCall

Plaintiff argues that during her February 5, 2021 meeting with Jodi McCall ("McCall"), she told McCall failed product was being shipped.  Doc. 65-2, pp. 12–13.  While Plaintiff argues "that McCall admits telling Plaintiff she would not be a part of shipping failed product clearly leads to the reasonable inference that Plaintiff raised a concern about failed product being shipped during her meeting with McCall," she misinterprets McCall's testimony.  Doc. 65-2, p. 13.

Although McCall responded "yes," when asked if she told Plaintiff she would not be part of shipping failed products, she testified she does not recall Plaintiff telling her SCC was shipping

---

[3] Defendant maintains and will present evidence that this incident has been fabricated.  Ramos did not say "it's too much paperwork," or anything to that effect and would never say he could not fix an issue because "it's too much paperwork."  Affidavit of Ivan Ramos ("Ramos Aff."), ¶¶ 7–8.

3

failed products.  Ex. B, Deposition of Jodi McCall, 55:14–56:6.  McCall's recollection is that Plaintiff told her the "quality was not up to par," McCall asked Plaintiff to give McCall specifics, and Plaintiff never gave McCall the requested list or followed up with McCall about her concerns.  Doc. 59-34, 55:14–56:1, 56:9–18, 57:14–22, 58:2–15; Doc. 59-19.  As evidenced by McCall's deposition testimony and affidavit, Plaintiff never complained to McCall about SCC shipping failed products, nor is there any documentation of such complaints prior to this litigation.  Doc. 59-34, 54:18–55:4, 55:14–56:1, 60:12–16; Doc. 59-19; Doc. 59-6, ¶ 6.  McCall's statement about her future intention not to ship failed products does not suggest she was told failed products were being shipped; rather, it demonstrates her commitment to product quality and safety.

**II.     SCC Did Not Violate Any Important And Clearly Articulated Public Policy.**

Plaintiff argues in her opposition that SCC violated public policy, but fails to state an "explicit statutory or constitutional provision" or "judicially conceived notion of public policy," SCC violated.  Doc. 65-2, pp. 19–20.  *See Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 699 (2002).  Nonetheless, she acknowledges in recognizing "the inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contours of the public policy exception," the Connecticut Supreme Court instructed courts deciding common law wrongful discharge claims to "look to see whether the plaintiff has . . . alleged that his discharge violated any *explicit statutory or constitutional provision* . . . or . . . contravened any *judicially conceived notion of public policy*."  *Id.* (emphasis added).

Plaintiff argues SCC violated an important public policy mandating that aerospace manufacturers and distributors follow stringent regulation and compliance requirements of a quality management system such as AS9100.  Doc. 65-3, p. 19.  The AS9100 is an international quality management system for aviation, space and defense organizations released by the Society

4

of Automotive Engineers, which is complementary to customer requirements and any applicable statutory or regulatory requirements. Society of Automotive Engineers, *Quality Management Systems - Requirements for Aviation, Space, and Defense Organizations AS9100D*, https://www.sae.org/standards/content/as9100d (last visited Apr. 25, 2022). Plaintiff has merely made generalized references to an *industry standard*, which is insufficient because "[a] claim of wrongful discharge must be predicated on an employer's violation of an important and clearly articulated public policy . . . ." *See Haberen v. Goodrich Pump & Engine Control Sys.,* 598 F. Supp. 2d 268, 272 (D. Conn. 2009) ("generalized references to internal policies, state and federal law, and industry standards are insufficient" where plaintiff's claim was predicated on AS9100).

### III.    Plaintiff Is Not Otherwise Without A Remedy.

Plaintiff contests SCC's argument that Plaintiff cannot succeed on her wrongful discharge claim because she is not otherwise without a remedy by arguing that Connecticut law allows a plaintiff to plead alternative and inconsistent theories of liability.[4] Doc. 65, p. 21. Plaintiff's argument blatantly ignores that in *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153, 161–63 (Conn. 2000), the Connecticut Supreme Court explicitly stated that the existence of a statutory remedy precludes a plaintiff from bringing a common law wrongful discharge claim.

Plaintiff alleges in Count Two that her employment was terminated after she "complained internally regarding the Defendant's violations of quality management," and that such "conduct by Defendant . . . constitutes a violation of public policy." Doc. 1, Ex. A, Count Two, ¶¶ 19–20. Plaintiff alleges SCC retaliated against her for her speech while employed by SCC–conduct for which Plaintiff has a statutory remedy under Conn. Gen. Stat. § 31-51q. *See Scaife v. City of*

---

[4] Neither of the cases cited by Plaintiff in support of this argument involve common law wrongful discharge claims. *See Read v. Town of Plymouth,* 110 Conn. App. 657, 661-62 (2008) (personal injury case); *Drier v. Upjohn*, 196 Conn. 242, 245 (1985) (medical malpractice case).

*Meriden,* 43 F. Supp. 3d 1, 37 (D. Conn. 2020).  As such, Plaintiff is not otherwise without a remedy and her common law wrongful discharge claim is precluded by Conn. Gen. Stat. § 31-51q.

### IV. Plaintiff Was Terminated Because Of Her Disrespectful And Insubordinate Behavior.

The Second Circuit has held "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. . . .  Instead, [she] must . . . provide the Court with some tangible proof to demonstrate that [her] version of what occurred was not imaginary." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003).  Plaintiff has not and cannot provide any tangible proof demonstrating that her employment was terminated for any reason other than her disrespectful and insubordinate behavior toward McCall in combination with her being at the last step in the progressive discipline process.  *See* Doc. 65-2, pp. 16–18, 21–23.  Neither Plaintiff's speech about failed products nor about rounding her clock-in times was a motivating factor in McCall's decision to terminate her employment.  *See* Doc. 59-34, 140:1-6.  Importantly, McCall was unaware of Plaintiff's prior speech about failed products.  Doc. 59-34, 54:18–55:4, 55:14–56:1, 60:12–16; Doc. 59-19; Doc. 59-6, ¶ 6.

"Although [t]he requisite degree of proof necessary to establish a *prima facie* case . . . on summary judgment is minimal . . . [the plaintiff] cannot defeat summary judgment simply by resting on bald allegations and self-serving conclusions." *Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 298–99 (2014).  This is especially true in cases such as this one where the plaintiff "has had the benefit of full discovery." *Id.*, at 299.  "[S]ubjective belief does not, as a matter of law, constitute objective evidence." *Id.*, at 311.  Here, subjective belief is all Plaintiff has.

### V. Plaintiff Cannot Provide Any Evidence That SCC's Legitimate Nonretaliatory Reason For Terminating Her Employment Was Pretextual.

Plaintiff argues in her Opposition that SCC's stated nonretaliatory reason for her employment termination–her disrespectful and insubordinate behavior toward McCall during the

6

March 3, 2021 meeting–is pretext and that the case comes down to a determination of credibility because Plaintiff disputes much of what occurred during her employment with SCC. Doc. 65-2, p. 24. Plaintiff's view of her behavior during the March 3, 2021 meeting cannot defeat summary judgment because in an employment termination case such as this one, "what matters is the perception of the decision maker." *Saliga v. Chemtura Corp.*, No. 12-cv-832 (VAB), 2015 U.S. Dist. LEXIS 133135, at *28 (D. Conn. Sept. 30, 2015). "[I]t is not enough for [an employee] merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a [fact finder] to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [unlawful] motive . . . ." *City of Hartford Police Dep't v. Comm'n on Human Rights & Opportunities*, 208 Conn. App. 755, 788–89 (2021) (*quoting Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006), cert. denied, 549 U.S. 1279 (2007)).

In *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 3:04cv1707 (PCD), 2006 U.S. Dist. LEXIS 68704, at *61 (D. Conn. Sept. 13, 2006), the plaintiff presented deposition testimony of a fellow employee, whose account of the plaintiff's behavior differed from that of his employer's. The plaintiff's coworker asserted that the plaintiff was "'very cordial to everyone he associates himself with,' . . . and 'a very nice person,' . . . and was '[v]ery friendly' when he interacted with doctors, was not insubordinate, and was not argumentative." *Id.* The court stated that "[t]he fact that one employee had a different view of Plaintiff's personality and conduct . . . is not sufficient to create an issue of fact as to whether Defendants' proffered explanation for his termination was pretextual. *At most, Plaintiff has shown that [his coworker] and [the decision maker] may have had a difference of opinion with regard to Plaintiff's conduct*." *Id.* (emphasis added). The plaintiff did not submit any evidence that his employer and other employee's "negative views of Plaintiff's

7

personality and performance came from a discriminatory animus.  A difference of opinion is not a legitimate basis for a finding of discrimination." *Id.*, at 62.

Plaintiff has submitted her deposition testimony and affidavit disputing SCC's witness testimony as to Plaintiff's behavior in the March 3, 2021 meeting.  In addition to her own testimony, Plaintiff also submitted an affidavit of former SCC employee Latoya Smith, who states: "At no time during the March 3, 2021 meeting did I observe Brittney Neal use the F word, become aggressive or slam anything on a desk."  Doc. 65-10, ¶ 14.  That Plaintiff's and one other employee's views of Plaintiff's conduct differ does not create an issue of fact as to whether SCC's reason for Plaintiff's employment termination was pretextual.  *See Ofoedu,* 2006 U.S. Dist. LEXIS 68704, at *61.  Plaintiff has merely disputed the accuracy of that reason.  She has not put forth specific facts from which a fact finder could find SCC's given reason is not only a sham, but a sham intended to cover up its real and unlawful motive, and, as such, cannot defeat summary judgment.  *See City of Hartford Police Dep't*, 208 Conn. App. at 788–89.

Additionally, although Plaintiff disputes that she was insubordinate and disrespectful toward McCall during the March 3, 2021 meeting, she does not dispute that McCall was upset and brought to tears by Plaintiff's conduct.  Doc. 59-33, 113:21–23, 122:8–10; Doc. 59-31, 153:1–2, 155:24–156:1; Doc. 59-34, 104:13–18; Doc. 59-8, ¶ 9.  McCall's perception, not Plaintiff's own perception, of Plaintiff's behavior is what matters here because McCall was the decision maker. *See Saliga*, 2015 U.S. Dist. LEXIS 133135, at *28.

      **A.**      **<u>Plaintiff's Cellphone Use And November 25, 2020 Incident</u>.**

As to Plaintiff's use of her cellphone in violation of SCC policy, she argues she was disciplined for conduct all employees were engaged in and she was just ordering lunch on her phone, which Schroeder acknowledged employees were allowed to do.  Doc. 65-2, p. 16.  First,

8

Plaintiff's argument ignores Schroeder's testimony that the other employees were not issued formal discipline for using their cell phones aside from a verbal warning from Schroeder because when asked to stop, they complied. Doc. 59-30, 107:7–12. Schroeder gave Plaintiff multiple "second chances," and she "kept abusing it." *Id.*, 13–15.

Additionally, Plaintiff's Opposition again inaccurately represents the deposition testimony of an SCC witness. During Schroeder's deposition, Attorney Cicchiello asked: "So if they want to order food for delivery, they would use their cellphone to do that; right?" Jeff responded: "That would be one way, yes." Ex. C, Deposition of Schroeder ("Schroeder Dep."), 105:23–106:2. Schroeder never stated, as Plaintiff asserts in her Opposition, that employees were allowed to use their phones to order lunch. Doc. 62-5, p. 16. In fact, according to SCC policy, the use of cell phones during working hours is restricted to break and lunch times, and limited to use only in the cafeteria, or outside the building. Doc. 59-12. The policy does not provide any exceptions for ordering lunch. *Id.*

As to the November 25, 2020 incident when Jim Streifel ("Streifel") told Plaintiff to put her cell phone away, Plaintiff does not dispute that she was disrespectful to Streifel when she went to his office, which was one of the reasons for her January 6, 2021 suspension, but she does argue that she only used her cell phone once that day to order lunch, that she had permission from management to use her phone to order lunch and that Dave Potter ("Potter") told Streifel she was allowed to use her phone to order lunch. Doc. 65-2, p. 27.

The number of times Plaintiff used her cell phone is immaterial. Plaintiff's use of her cell phone, whether once or twice, was in violation of SCC's written cell phone policy prohibiting employees from using cell phones during working hours. Doc. 59-12. Streifel, the manager in charge of the facility on November 25, 2022, observed Plaintiff using her cell phone in violation

9

of SCC policy and told her to put it away, after which Plaintiff stormed into Streifel's office and disrespectfully yelled at him. Doc. 59-7, ¶ 5–10.

Plaintiff argues that she had permission from management to use her phone, but does not specify which manager authorized such use. Doc. 65-2, p. 27. Schroeder, her direct supervisor who was out on November 25, 2020, did not authorize Plaintiff to use her cell phone to order lunch that day. Ex. C, Schroeder Dep., 105:17–18. Inasmuch as Plaintiff may argue that Potter gave her permission to use her cell phone, Potter is not a supervisor or manager with authority to approve an employee's use of his or her cell phone; he is the Quality Administrator. Bowen Aff., ¶ 12.

### B. FLSA Retaliation Claim

As to Count Four, Plaintiff argues in her Opposition that there is a causal connection between her complaints about her clock-in times being rounded and her employment termination because she made these complaints "in the week and days immediately prior to her employment termination." Doc. 65-2, p. 22. Plaintiff does not provide any other evidence aside from temporal proximity to establish a causal connection. "Although temporal proximity *may* give rise to an inference of retaliation at the prima facie stage, without more, such temporal proximity is insufficient to satisfy [Plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

### VI. Conclusion

For the foregoing reasons and for the reasons already demonstrated in SCC's Motion for Summary Judgment, the court should dismiss the four-count Complaint in its entirety.

**SPECIALTY CABLE CORP.**

By: /s/ Glenn A. Duhl
Glenn A. Duhl ct03644
Adam J. Lyke ct30487
Zangari Cohn Cuthbertson
    Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
GAD:  (203) 786-3709
AJL:   (203) 786-3709
Fax:   (203) 782-2766
gduhl@zcclawfirm.com