UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
BRITTNEY NEAL                 :    Civ. No. 3:21CV00497(SALM)
                              :
v.                            :
                              :
SPECIALTY CABLE CORP.         :    September 29, 2022
                              :
------------------------------x
```

## RULING ON MOTION FOR SUMMARY JUDGMENT [Doc. #59]

Defendant has filed a motion pursuant to Federal Rule of Civil Procedure 56(a), seeking the entry of summary judgment on each count of the Complaint. See Doc. #59. Plaintiff has filed a memorandum in opposition to the motion, see Doc. #65, to which defendant has filed a reply. See Doc. #70. Plaintiff has withdrawn Count Three of the Complaint. See Doc. #65-2 at 1. For the reasons set forth herein, defendant's Motion for Summary Judgment [**Doc. #59**] is **GRANTED** as to Count Two of the Complaint and **DENIED** as to Count One and Count Four of the Complaint.

## I.   Procedural Background

Plaintiff filed this action against Specialty Cable Corp. ("SCC" or "defendant") in Connecticut Superior Court on March 17, 2021, alleging that she was terminated by SCC in retaliation for raising certain concerns about product quality and SCC's timekeeping practices. See Doc. #1. SCC removed this action to federal court on April 9, 2021. See id.

This matter was transferred to the undersigned on October 13, 2021. See Doc. #41.

On December 9, 2021, after the close of discovery, plaintiff filed a Motion to Amend. See Doc. #50. Plaintiff sought to amend her complaint to assert that she was terminated by SCC because she "spoke out as a citizen on a matter of public concern when raising issues with the Defendant's failure to adhere to health department COVID-19 protocols." Doc. #50-2 at 5.

The Court denied plaintiff's Motion to Amend on February 14, 2022, holding: "[W]here, as here, plaintiff knew the facts underlying her claim for nearly a year, but waited until after the close of discovery to set forth her new theory, good cause does not exist to permit plaintiff's belated amendment." Doc. #58 at 12. The matter therefore proceeded on the original Complaint.

Defendant filed the instant Motion for Summary Judgment on February 21, 2022. See Doc. #59.

## II.  **Legal Standard**

The standards governing summary judgment are well-settled. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)[.]

Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir.

2002). Summary judgment is proper if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett*,* 477 U.S. 317, 323 (1986).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." Marvel Characters, Inc., 310 F.3d at 286. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

In deciding a motion for summary judgment, the Court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation and quotation marks omitted). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*,* 446 F.3d 313, 315 (2d Cir. 2006) (citation and quotation marks omitted).

III. **Discussion**

Defendant moves for summary judgment on all remaining counts of the Complaint. See Doc. #59. Count One of the Complaint asserts a claim for "Wrongful Termination in Violation of Conn. Gen. Stat. §31-51q[.]" Doc. #1 at 8. Count Two of the Complaint asserts a claim for "Common Law Wrongful Discharge." Id. at 9. Count Four of the Complaint asserts a claim for "Retaliation In Violation Of The Fair Labor Standards Act[.]" Id. at 11.

**A.    Count One: Conn. Gen. Stat. §31-51q**

Defendant moves for summary judgment as to plaintiff's claim that it violated Section 31-51q. The statute provides, in relevant part:

> Any employer ... who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer ... shall be liable to such employee for damages caused by such discipline or discharge[.]

Conn. Gen. Stat. §31-51q (amended July 1, 2022).[1]

--------

[1] This statute was recently amended by Public Act No. 22-24, which took effect on July 1, 2022. The amendment largely consists of additions to the language of Section 31-51q, and provides employees with a remedy if they have been disciplined or discharged based upon the "refusal to (A) attend an employer-sponsored meeting with the employer or its agent, representative or designee, the primary purpose of which is to communicate the

Section 31-51q retaliation claims are analyzed using the three-step McDonnell Douglas burden-shifting analysis. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); see also Perez-Dickson v. Bridgeport Bd. of Educ., No. FBT-CV-13-6033116, 2016 WL 7742923, at *3 (Conn. Super. Ct. Dec. 5, 2016) (applying McDonnell Douglas framework to "free speech retaliation claims made pursuant to ... Section 31-51q"); Fasoli v. City of Stamford, 65 F. Supp. 3d 285, 296-97 (D. Conn. 2014) (explaining that analysis of claims made pursuant to Section 31-51q is essentially the same as the McDonnell Douglas framework).

The first step of the McDonnell Douglas framework requires plaintiff to establish a prima facie case of retaliation. See Fasoli, 65 F. Supp. 3d at 296. To establish a prima facie case under Section 31-51q, a plaintiff must produce facts showing:

> (1) [S]he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) [s]he was disciplined or terminated on account of h[er] exercise of such rights; and (3) h[er] exercise of h[er] First Amendment (or equivalent state constitutional rights) did not substantially or materially interfere with h[er] bona fide job performance or with h[er] working relationship with

---

employer's opinion concerning religious or political matters, or (B) listen to speech or view communications, the primary purpose of which is to communicate the employer's opinion concerning religious or political matters[.]" Conn. Gen. Stat. §31-51q(b). The Court finds that the amendments do not impact the analysis of the pending motion, and relies upon the version of the statute that was in effect when the events giving rise to this litigation occurred, and when this action was filed.

h[er] employer.

Id. at 295.

If a plaintiff establishes a prima facie case, then the burden shifts to the defendant to articulate "a non-retaliatory reason for the employment action." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013). If the employer proffers such a reason, then the "presumption of retaliation arising from the establishment of the prima facie case drops from the picture." Id. The burden then shifts back to the plaintiff to come forward with evidence that the "non-retaliatory reason is a mere pretext for retaliation." Id.

Defendant asserts that plaintiff has failed to establish a prima facie case of retaliation on two grounds: (1) plaintiff's speech does not qualify as protected speech under Section 31-51q because the speech was not on a matter of public concern, see Doc. #59-2 at 7; and (2) plaintiff has not shown a causal connection between her speech and the employer's adverse action. See id. at 16. Defendant further asserts: (3) "SCC had a legitimate nonretaliatory reason for Plaintiff's employment termination[,]" id. at 19; and (4) "Plaintiff cannot produce any evidence to establish that SCC's legitimate nonretaliatory reason for her employment termination was pretext for retaliation." Id. at 28.

The Court finds that genuine disputes of material fact

exist that preclude the entry of summary judgment on Count One.[2]
"SCC is a Connecticut corporation which engineers and
manufactures high performance electrical wire and cable for
military and aerospace applications, and for other commercial
and industrial applications." Doc. #59-1 at 1, ¶1; Doc. #65-1 at
1, ¶1. "On June 26, 2020, Plaintiff began her employment as a
Quality Assurance Technician ('QA Tech') at SCC. Plaintiff's job
responsibilities as a QA Tech included performing destructive
and electrical tests on SCC's cables in accordance with SCC's
documented quality test procedures." Doc. #59-1 at 1, ¶2
(citations omitted); Doc. #65-1 at 1, ¶2.

Defendant does not dispute that plaintiff began raising
concerns regarding the quality of the products she was testing
shortly after her employment began. Defendant asserts:
"Plaintiff made complaints to Schroeder when tests she was
conducting failed." Doc. #59-1 at 6, ¶21.[3] Those complaints
apparently continued: "Plaintiff told McCall that the quality at

---

[2] To establish the undisputed facts, the Court relies largely on
defendant's Statement of Material Facts, Doc. #59-1, to the
extent those facts are admitted by plaintiff in her response,
Doc. #65-1.

[3] The Court notes that the parties spell the last name of
plaintiff's supervisor, Jeffrey Schroeder, differently in their
submissions. Plaintiff spells his last name "Schroder". See Doc.
#65-1 at 1. Defendant spells his last name "Schroeder." See Doc.
#59-1 at 1. The Court adopts the spelling "Schroeder" based upon
the "Affidavit of Jeffrey Schroeder." Doc. #59-5.

SCC was 'not up to par' in comparison to the quality at her former employer, Coca Cola, but did not provide McCall with any specifics." Doc. #59-1 at 7, ¶26. "Plaintiff did not know what happened to the product after she reported it as a failure." Doc. #59-1 at 5, ¶17.

Plaintiff describes certain specific incidents of her allegedly reporting product failure: "On September 23, 2020, Plaintiff found several failures and notified Schroder, who still passed the wire. Plaintiff and Schroder went back and forth about passing the wire because Plaintiff disputed that the wire was no good." Doc. #65-1 at 14, ¶9. "On September 29, 2020, Plaintiff had a wire that was cracked and did not pass the wet dielectric test. Plaintiff notified Schroder. Plaintiff refused to turn in her packed because the product had failed. Schroder and Plaintiff again went back and forth about Schroder still passing the product." Id. at 14, ¶10 (sic). "On October 15, 2020, November 5, 2020, and November 11, 2020 Plaintiff found more failed product that was still sent out for sales despite failing quality testing." Id. at 14, ¶11. Defendant did not file a response to plaintiff's counterstatement of facts, so it has not admitted or denied these statements. However, defendant's submissions make it clear that defendant does not contest plaintiff's general assertion that she complained about quality issues to her supervisors. See, e.g., Doc. #70 at 3

("Plaintiff's concerns as to failed quality testing are not a matter of public concern because no failed products were ever shipped.").

Plaintiff asserts that she was disciplined, and ultimately terminated, for speaking out concerning product quality issues. The first disciplinary incident occurred on December 3, 2020. See Doc #59-1 at 2, ¶7; Doc. #65-1 at 1-2, ¶7. SCC maintained a written policy, included in the Employee Handbook, "that using cell phones within the plant was strictly forbidden and that violations of the policy **'may lead to disciplinary action, up to and including immediate termination of employment.'**" Doc. #59-1 at 2, ¶6 (emphases in original) (citation omitted); Doc. #65-1 at 1, ¶6.

> During Plaintiff's employment with SCC, she used her cell phone in violation of SCC's written policy. Schroeder spoke with Plaintiff about her cell phone use a number of times but she did not stop using it. On December 3, 2020, Plaintiff was given a written warning for her cell phone use in violation of SCC's written policy on November 24, 25, and 30, 2020.

Doc #59-1 at 2, ¶7 (citations omitted); Doc. #65-1 at 1-2, ¶7. Plaintiff does not dispute that she used her phone while at work on the dates described in the written warning, but asserts that on certain occasions she had permission to use her phone, and that "other employees also used their phone and Plaintiff was the only one disciplined." Doc. #65-1 at 1, ¶7.

Plaintiff was disciplined again on January 6, 2021; the

asserted reason for the discipline was plaintiff's "rude behavior and insubordination" toward a supervisor on November 25, 2020, and in an email to Human Resources Manager Alicia DiDominzio. Doc. #59-1 at 4, ¶13; Doc. #65-1 at 3, ¶14.[4] The email that defendant contends triggered the suspension arose out of a dispute regarding vacation time. "Plaintiff requested time off for December 22 and 23, 2020." Doc. #59-1 at 3, ¶10; Doc. #65-1 at 2, ¶10. Plaintiff "did not have any vacation time available so DiDominzio allowed her to take an unpaid day on December 22, 2020, and borrow eight hours of vacation time from 2021 to use on December 23, 2020. On December 31, 2020, Plaintiff was paid for twenty-four hours by direct deposit and given an advance of eight hours by live check for the borrowed vacation time." Doc. #59-1 at 3, ¶10 (citation omitted); Doc. #65-1 at 2, ¶10.

Plaintiff sent DiDominzio the following email on December 31, 2020:

> Itys always a problem when it comes to vacation days being used... My check was only for 24 hours I was not paid for my last vacation day that I was approved to use on the 23rd!!! I filled out the form and handed it in prior to me taking the day off and even had a discussion with you!! You may live comfortably but I don't!!!! I have rent to pay tomorrow if the 1st!!!! and here we are with another problem, I need a check cut ASAP this is ridiculous!!!! On top of no one being here!!!! I need my

---

[4] Plaintiff admits "what the suspension documentation states," but disagrees that this was the real reason for the suspension. Doc. #65-1 at 3, ¶14.

pay ASAP!!!!! I have bills!!!!!!

Doc. #59-16 at 2 (sic). On January 6, 2021, plaintiff was issued a three-day suspension for "continu[ing] to demonstrate rude behavior and insubordination." Doc. #59-18 at 2.[5]

Plaintiff was terminated on March 3, 2021. See Doc. #59-1 at 12, ¶53; Doc. #65-1 at 12, ¶53. On that day, plaintiff's supervisor at the time, Jodi McCall, "held a meeting with the QA Department. McCall, Plaintiff, Latoya Smith, Jose Pacheco, Timothy Kirkland, Julio Valentin and Javier Lopez attended this meeting." Doc. #59-1 at 10, ¶40 (citation omitted); Doc. #65-1 at 10, ¶40. The parties dispute exactly what occurred during the meeting, particularly in regard to plaintiff's conduct.

Defendant has submitted affidavits, deposition testimony, and contemporaneous meeting notes providing McCall, Valentin, and Pacheco's accounts of the meeting. McCall contends that plaintiff "was speaking over me, and the loss of control of the meeting occurred because of her and her behavior." Doc. #59-34 at 21. According to McCall, plaintiff "was relentless in the meeting and badgering and harassing me about [an overtime

---

[5] Plaintiff asserts that she was suspended "after disagreeing with Schroder and DiDominzio in regards to the Defendant's inadequate COVID-19 protocols and threatening to call the health department." Doc. #65-2 at 17 (sic). The Court denied plaintiff's Motion to Amend her Complaint to assert claims related to COVID-19. See Doc. #58. The operative complaint brings no such claims. Accordingly, such claims are not properly before the Court and will not be considered.

issue], I kept saying to her, let me read the handbook and let
me talk to HR. She would not let the meeting end." Id. at 24.
McCall's meeting notes further indicate: "As the discussion
progressed, [plaintiff] became more and more frustrated. The
displays of frustration included: agitated body language,
raising of her voice, audibly saying 'Fuck', slamming items on
her desk, and exiting the room while [McCall] was trying to
respond to her concerns." Doc. #59-21 at 5.

Valentin describes his recollection of the meeting in an
affidavit:

> During this meeting, plaintiff was combative,
> aggressive, and not receptive to anything McCall
> was saying. Plaintiff referred to McCall in the meeting as
> 'this lady' and made an offensive hand gesture -- bending
> her right arm at the elbow and raising her fist while
> placing her left hand on the inside of her right elbow.
> ... Plaintiff yelled 'fuck' and slammed something on her
> desk loudly, causing a disruption. ... Plaintiff
> continued to rant and attack McCall for two to three
> minutes while McCall stood there silently and said
> nothing.

Doc. #59-9 at 1.

Lopez has also provided his account of the meeting in an
affidavit. His affidavit states that plaintiff "was
argumentative and was repeatedly attacking McCall and cutting
McCall off midsentence. ... Plaintiff did not give McCall a
chance to gather the information necessary to address
Plaintiff's concerns. Instead, she kept berating McCall about
the work schedule. Plaintiff's behavior was disrespectful[.]"

Doc. #59-8 at 1. Crucially, however, Lopez does <u>not</u> report that plaintiff slammed the table, made an offensive gesture, or used profanity.

Plaintiff has submitted her own deposition testimony and an affidavit from Latoya Smith. At her deposition, plaintiff testified that "we had a meeting with everyone, and everyone was frustrated. Everyone was talking over everyone in that meeting. ... No. I was not frustrated. I actually calmed the meeting down." Doc. #65-4 at 36-37; <u>see also</u> Doc. #65-4 at 66-67. Importantly, plaintiff denies raising her voice, slamming the table, making an offensive gesture, or using profanity during the meeting. <u>See</u> Doc. #65-4 at 34, 39.

The affidavit submitted by Latoya Smith is consistent with plaintiff's description of the meeting. Smith states:

> I personally witnessed Brittney Neal tell other employees in the QA department to calm down during the March 3, 2021 meeting. ... At no time during the March 3, 2021 team meeting did I observe Brittney Neal use the F word, become aggressive or slam anything on a desk.

Doc. #65-11 at 3.[6]

Following the meeting, "McCall went to DiDominzio's office to tell her what happened and DiDominzio called [SCC CEO Kim] Bowen to join the discussion. Bowen instructed McCall to review

---

[6] Neither party has provided deposition testimony or affidavits from Pacheco or Kirkland. This is noteworthy, especially if these two individuals remain employees of defendant.

Plaintiff's personnel file to see where she was in the
disciplinary process and determine what the next step should
be." Doc. #59-1 at 11, ¶48 (citation omitted); Doc. #65-1 at 11,
¶48.

> McCall, DiDominzio and Bowen met with Plaintiff on March
> 3, 2021, at 1:20 p.m., presented her with an Employee
> Warning Record Form and informed her that her employment
> was terminated effective immediately. When Plaintiff
> asked McCall why her employment was being terminated,
> McCall replied that the decision was based on the events
> that took place at the meeting that morning and the
> history of behavior in her personnel file.

Doc. #59-1 at 12, ¶53 (citation omitted); Doc. #65-1 at 12, ¶53.

Defendant now moves for summary judgment as to Count One,
arguing that plaintiff has failed to establish a prima facie
case under Section 31-51q for two reasons: (1) plaintiff's
"speech was not protected by §31-51q because she did not speak
on a matter of public concern[,]" Doc. #59-2 at 7; and (2)
plaintiff fails to establish the element of causation because
"her employment was not terminated on account of any
constitutionally protected speech." Id. Both arguments fail.

  1.   Prima Facie Case

In order to establish a prima facie case of
retaliation under Section 31-51q, a plaintiff must produce
facts showing:

> (1) [S]he was exercising rights protected by the First
> Amendment to the United States Constitution (or an
> equivalent provision of the Connecticut Constitution);
> (2) [s]he was disciplined or terminated on account of

~ 14 ~

> h[er] exercise of such rights; and (3) h[er] exercise of
> h[er] First Amendment (or equivalent state
> constitutional rights) did not substantially or
> materially interfere with h[er] <u>bona</u> <u>fide</u> job
> performance or with h[er] working relationship with
> h[er] employer.

<u>Fasoli</u>, 64 F. Supp. 3d at 295.

Defendant challenges the first two elements of the prima facie case. First, defendant asserts that plaintiff's speech does not qualify as protected speech under Section 31-51q because the speech was not on a matter of public concern. "Plaintiff's speech about SCC products failing quality tests was not a matter of public concern" because "Plaintiff never made any complaints about failed products <u>being sent to customers</u> to any member of SCC management who played a role in Plaintiff's disciplinary actions." Doc. #59-2 at 8 (emphasis in original). Second, defendant argues that plaintiff has not shown a causal connection between the exercise of her constitutional rights and a disciplinary action. <u>See</u> Doc. #59-2 at 16.

At summary judgment, the "requisite degree of proof necessary to establish a prima facie case ... is minimal[.]" <u>Fasoli</u>, 64 F. Supp. 3d at 298 (citation and quotation marks omitted). The Second Circuit has "repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." <u>Gorzynski v. Jetblue Airways Corp.</u>, 596

F.3d 93, 101 (2d Cir. 2010) (citation and quotation marks
omitted).

> a.   Matter of Public Concern

Defendant argues that plaintiff's speech regarding
quality issues was not protected by Section 31-51q because
she did not speak on a matter of public concern. See id.
"Most employee speech is not protected under §31-51q." Doe
v. Paychex, Inc., No. 3:17CV02031(VAB), 2019 WL 2027080, at
*11 (D. Conn. May 6, 2019). "To qualify as protected
activity under this statute, [an employee's] speech must be
on a matter of public concern." McClain v. Pfizer, Inc.,
692 F. Supp. 2d 229, 241 (D. Conn. 2010) (citation and
quotation marks omitted).

"Statements of public concern are those that can fairly be
considered as relating to any matter of political, social, or
other concern to the community." Karagozian v. Luxottica Retail
N. Am., 147 F. Supp. 3d 23, 36 (D. Conn. 2015) (citation and
quotation marks omitted). In determining whether speech relates
to a matter of public concern, a court evaluates "the content,
form, and context of a given statement, as revealed by the whole
record." Id. (citation and quotation marks omitted). "The fact
that a statement was made to the employer in private is not
determinative of whether its subject was a matter of public
concern." Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011).

The Connecticut Supreme Court has clarified that Section 31-51q generally protects employee speech that "involves a comment on official dishonesty, deliberately unconstitutional action, or other serious wrongdoing, or threats to health and safety." Trusz v. UBS Realty Inv'rs, LLC, 123 A.3d 1212, 1232 (Conn. 2015). This is because speech concerning serious wrongdoing or threats to public safety typically involves "a broader public purpose" that is "of inherent interest to society at large," and is not merely "calculated to redress [the employee's] personal grievances[.]" Daley v. Aetna Life & Cas. Co., 734 A.2d 112, 121-22 (Conn. 1999) (citation and quotation marks omitted).

Defendant contends that plaintiff did not speak on a matter of public concern because "Plaintiff never made any complaints about failed products being sent to customers[.]" Doc. #59-2 at 8 (emphasis in original). "When Plaintiff complained about quality tests failing," defendant contends, "she was speaking pursuant to her official job duties as a Quality Assurance Technician ('QA Tech') and did not address any wrongdoing by SCC that could be of concern to the community." Id. at 9. The Court disagrees.

The mere fact that the products about which plaintiff raised concerns may not ultimately have been delivered to customers does not mean that plaintiff's statements about those

products did not touch upon a matter of public concern.[7]
Defendant concedes that it "engineers and manufactures high
performance electrical wire and cable for military and aerospace
applications, and for other commercial and industrial
applications." Doc. #59-1 at 1, ¶1. Defendant also admits that
plaintiff was responsible for testing such products. See id. at
1, ¶2. Plaintiff's statements about the quality of those
products were, therefore, plainly not "calculated to redress
personal grievances[.]" Lewis v. Cowen, 165 F.3d 154, 163 (2d
Cir. 1999). Rather, such statements served "[the] broader public
purpose[,]" id. at 163-64, of ensuring that the products did not
present a risk to the safety of passengers on military and
commercial aircraft, or other consumers of the products. See
Doc. #65-15 at 10 (Plaintiff contends in sworn discovery
responses that she "specifically raised concern about how this
product is being put into airplanes and military planes which is
a safety risk."). Because plaintiff's statements served the
broader purpose of ensuring public safety, the Court finds
plaintiff has established, for the purposes of this motion, that

---

[7] The Court notes, moreover, that plaintiff disputes defendant's
assertion that the products she raised concerns about were not
shipped to customers. See Doc. #65-1 at 4-6, 14-15. The Court
need not decide whether plaintiff has raised a genuine dispute
of material fact as to this issue, however, because the Court
finds that plaintiff's statements addressed a matter of public
concern even if the product was not ultimately shipped to
customers.

such statements address a matter of public concern. See Trusz, 123 A.3d at 1232 (holding that speech touches on matter of public concern when it "implicates ... threats to health and safety").

The fact that "[w]hen Plaintiff complained about quality tests failing, she was speaking pursuant to her official job duties as a Quality Assurance Technician ('QA Tech')" does not alter the Court's conclusion. Doc. #59-2 at 9. The Connecticut Supreme Court has expressly held that "employee speech pursuant to official job duties on certain matters of significant public interest is protected from employer discipline" and that Section 31-51q extends this "protection to employee speech pursuant to official job duties in the private workplace." Trusz, 123 A.3d at 1214. "Under this standard, if an employee's job related speech reflects a mere policy difference with the employer, it is not protected. It is only when the employee's speech is on a matter of public concern and implicates ... threats to health and safety that the speech trumps the employer's right to control its own employees and policies." Id. at 1232 (citation and quotation marks omitted). Plaintiff has produced evidence that her statements about SCC's product quality were focused on potential "threats to health and safety[.]" Id. Such statements would be protected under Section 31-51q even if plaintiff made them pursuant to her official job duties.

Defendant also contends, in connection with this argument, that plaintiff did not make any statements on a matter of public concern to "any member of SCC management who played a role in Plaintiff's disciplinary actions." Doc. #59-2 at 8. However, to whom plaintiff was speaking when she made the statements at issue is irrelevant to whether those statements addressed a matter of public concern. The Court construes this as an argument that plaintiff cannot show causation between her complaints and her termination. However, defendant does not proffer evidence that the decision-makers who participated in the decision to discipline and then terminate plaintiff were unaware of her complaints.

In sum, the Court finds that defendant has failed to establish that no genuine dispute of material fact exists as to whether plaintiff's statements addressed a matter of public concern. Defendant's arguments that those statements were made pursuant to plaintiff's official job duties, and that plaintiff did not make such statements to an employee that played a role in terminating her, do not alter this conclusion. Accordingly, defendant has failed to establish that plaintiff's prima facie case fails on this element.

### b.   Causal Connection

The second element of the prima facie case requires a causal connection between the protected activity and the adverse

action. A plaintiff can establish a causal connection "even without direct evidence of causation[.]" Zann Kwan, 737 F.3d at 845. The Second Circuit has held that "a plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Gorzynski, 596 F.3d at 110 (citation and quotation marks omitted).

The period for "temporal proximity between protected activity and adverse action ... is measured from the date of the employer's knowledge of the protected activity." Kim v. Columbia Univ., 460 F. App'x 23, 25 (2d. Cir. 2012) (citation and quotation marks omitted). Though the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [the Circuit] has previously held that five months is not too long to find the causal relationship." Gorzynski, 596 F.3d at 110 (citation and quotation marks omitted).

Where plaintiff has engaged in ongoing protected activity the Court will use the most recent protected activity that defendant is aware of to measure temporal proximity. See Kim, 460 F. App'x at 25; see also A.S. v. City Sch. Dist. of Albany, No. 1:21CV00620(BKS), 2022 WL 356697, at *16 (N.D.N.Y. Feb. 7,

2022) (analyzing temporal proximity from plaintiff's most recent protected activity of which Defendants were aware). "[C]lose temporal proximity between plaintiff's protected speech and the commencement of [a] series of allegedly adverse actions is indirect evidence of a causal connection between the two." Rolon v. Ward, No. 05CV00168(WCC), 2008 WL 4700705, at *24 (S.D.N.Y. Oct. 24, 2008), aff'd, 345 F. App'x 608 (2d Cir. 2009).

The record reflects that plaintiff complained about product quality throughout her employment, and plaintiff has proffered evidence, not rebutted by defendant, that this began as early as September through November of 2020. See Doc. #65-1 at 14. Defendant first disciplined plaintiff when it issued her a warning for using her cell phone on December 3, 2020; she was again disciplined on January 6, 2021; and when she was terminated on March 3, 2021, this history was part of the stated basis for her termination. See Doc. #59-1 at 12, ¶¶52, 53. Plaintiff has proffered evidence that defendant's adverse employment actions began no more than one month after she engaged in protected speech. This close temporal proximity is sufficient to support a causal connection at the prima facie stage. See McClain, 692 F. Supp. 2d at 240 (Temporal proximity of five months between plaintiff's complaint and her termination "raises at least a genuine issue of material fact as to whether there was a causal connection between [the protected activity]

and her termination." (citation and quotation marks omitted)). The Court finds that plaintiff has provided sufficient evidence of a causal connection to satisfy this element of the prima facie case.

Defendant challenges plaintiff's prima facie case on only two grounds: that plaintiff did not speak on a matter of public concern and that there was no causal connection between her speech and her termination. See Doc. #59-2 at 8; Doc. #59-2 at 16. The Court finds these elements met; plaintiff has satisfied the "requirements of McDonnell Douglas's minimal version of a prima facie case." Fasoli, 64 F. Supp. 3d at 297. Thus, the burden shifts to defendant to provide a legitimate nonretaliatory reason for terminating plaintiff.

2.   Legitimate Nonretaliatory Reason

Defendant asserts that "SCC had a legitimate nonretaliatory reason for Plaintiff's employment termination[.]" Doc. #59-2 at 19. Specifically, defendant contends that plaintiff's termination was "based on her behavior in the March 3, 2021 staff meeting and where she was in the progressive discipline process." Doc. #59-1 at 12, ¶52, Doc #65-1 at 12, ¶52. Plaintiff does not contest that defendant has satisfied its burden as to this issue. Accordingly, the burden shifts back to plaintiff to show that the legitimate, nonretaliatory, reasons offered by defendant for terminating plaintiff were pretextual.

3.   Pretext

In the last step of the McDonnell Douglas framework, "the burden shifts back to the plaintiff to produce evidence from which a reasonable jury could find that the employer's stated reason is merely pretext for illegal retaliation." Fasoli, 64 F. Supp. 3d at 297. To establish pretext, a plaintiff must show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

The Second Circuit has held: "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." Zann Kwan, 737 F.3d at 847 (emphases added). A plaintiff may establish pretext by, inter alia, "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Id. at 846.

"To survive summary judgment, the plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by the defendant were false, and that more likely than not ... retaliation was the real reason for the employment

action." DeMuth v. U.S. Small Bus. Admin., 819 F. App'x 23, 25 (2d Cir. 2020), cert. denied sub nom. DeMuth v. Small Bus. Admin., 141 S. Ct. 1741 (2021) (citation and quotation marks omitted).

Defendant contends that "Plaintiff cannot produce any evidence to establish that SCC's legitimate nonretaliatory reason for her employment termination was pretext for retaliation." Doc. #59-2 at 28. Plaintiff argues that the "present case comes down to a determination of credibility because there are significant material facts in dispute surrounding all of the disciplinary action taken against the Plaintiff including her termination." Doc. #65-2 at 24.

Defendant's stated reason for terminating plaintiff was her "behavior in the March 3, 2021 staff meeting and where she was in the progressive discipline process." Doc. #59-1 at 12. The first disciplinary action taken against plaintiff, and thus the first step in the progressive discipline process, occurred on December 3, 2020, when plaintiff was issued a written warning for using her cell phone. See Doc. #59-1 at 2, ¶7; Doc. #65-1 at 1-2, ¶7. Plaintiff admits that she used her cellphone in violation of SCC's policy. See Doc. #65-1 at 1. Plaintiff contends that other employees previously used their cellphones in the workplace, but "[p]laintiff was the only one issued a discipline for being on her phone." Doc. #65-2 at 26. She

contends that the discipline was in fact issued because of her complaints about product quality. See id.

"A showing that similarly situated employees belonging to a different group received more favorable treatment can ... serve as evidence that the employer's proffered legitimate, non-[retaliatory] reason for the adverse job action was pretext for [retaliation]." Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000).

Defendant does not contest plaintiff's assertion that other employees had used their cellphones in the workplace without facing discipline. Defendant appears to contend, however, that plaintiff was not similarly situated to those employees "because when asked to stop [using their cellphones], they complied." Doc. #70 at 11 (citing Doc. #59-30 at 23). Plaintiff offers conflicting evidence, however. She testified at her deposition:

> [Plaintiff's supervisor] had told Jose Pacheco several times, even I was standing right there when he told him to put his phone away, that he can't watch movies on his phone. It wasn't a written thing. He didn't get a suspension for it. He just would verbally say something to him whenever he seen him multiple times. It was kind of pretty much with anybody. If you got caught with your phone in your hand, then they would come and say something to you. It was only me that got written up for it.

Doc. #65-4 at 58 (sic). Whether plaintiff was given a written warning for using her cellphone while other employees who did not engage in protected speech were verbally reprimanded for

engaging in the same conduct presents a disputed issue of material fact. The Court finds that a reasonable jury could conclude that defendant's decision to issue plaintiff a written warning for using her cell phone was pretext for retaliation. See Graham, 230 F.3d at 42 ("That Elmendorf, a white employee, then received a second last chance waiver upon his second violation of the Policy, while Graham, a black employee, did not, raises an inference that Graham's dismissal for the second violation was a result of race discrimination.").

The evidence also reveals a disputed issue of material fact as to whether defendant's statement that it terminated plaintiff due to her conduct during the March 3, 2021, meeting was pretextual. See Doc. #59-1 at 12. As described above, the record contains sharply conflicting evidence regarding plaintiff's conduct at that meeting. Plaintiff and Smith each assert that plaintiff did not use profanity, raise her voice, or slam anything on her desk during the meeting. See Doc. #65-4 at 39; see also Doc. #65-11 at 3. Rather, Smith and plaintiff each contend that plaintiff "calmed ... people down and was praised for calming those people down." Doc. #65-4 at 37; see also Doc. #65-11 at 3. McCall and Valentin, on the other hand, have averred that "[a]s the discussion progressed, Brittney became more and more frustrated. The displays of frustration included: agitated body language, raising of her voice, audibly saying

'Fuck', slamming items on her desk, and exiting the room while [McCall] was trying to respond to her concerns." Doc. #59-21 at 5; see also Doc. #59-9 at 1. Lopez has provided a sworn statement that is not entirely consistent with either version of events; he affirms that plaintiff "was argumentative and was repeatedly attacking McCall and cutting McCall off midsentence." Doc. #59-8 at 1. Lopez does not, however, support McCall and Valentin's claims that plaintiff slammed the table, made an offensive gesture, or used profanity.

Summary judgment is appropriate only where there is no "evidence in the record that could reasonably support a jury's verdict for the non-moving party[.]" Am. Home Assurance Co., 446 F.3d at 315 (citation and quotation marks omitted). Here, the evidence of record is deeply conflicting: two witnesses support plaintiff's contentions; two support defendant's proffered basis for termination; one lies somewhere in between; and two have provided no statements. This dispute demonstrates "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan, 737 F.3d at 846. "From such discrepancies, a reasonable juror could conclude that the explanations [for terminating plaintiff] were a pretext for a prohibited reason." Id. Defendant has failed to meet its burden of establishing that no genuine dispute of material fact exists, and summary judgment

as to Count One is not warranted.

### B.   Count Four: FLSA Retaliation

Defendant moves for summary judgment on plaintiff's FLSA retaliation claim. Notably, defendant dedicates less than two pages of its briefing to this argument. See Doc. #59-2 at 34-35.

"On March 1, 2021, Plaintiff asked DiDominzio for a copy of Plaintiff's timecard showing her clock-in times." Doc. #59-1 at 9, ¶38; Doc. #65-1 at 9, ¶38. Plaintiff contends that she requested this information because she believed "something was off" and that her timecards

> reflected the rounded time and Plaintiff knew all of her
> punches were not on exactly 15 minute increments. ...
> This was because Plaintiff had been aware of an incident
> at a prior employer where she had been compensated due
> to the employers inappropriate rounding of her time.
> Plaintiff made DiDominzio aware of this prior experience
> with a prior employer and notified DiDominzio that
> because of that she wanted her actual punch in and out
> times so she could assess whether she was being paid
> correctly.

Doc. #65-1 at 9-10, ¶38 (sic).

As described earlier, plaintiff's employment was terminated two days later, purportedly as a result of her "behavior in the March 3, 2021 staff meeting and where she was in the progressive discipline process." Doc. #59-1 at 12, ¶52.

Count Four brings a claim for retaliation under the FLSA, alleging that "Defendant retaliated against and terminated Plaintiff in response to her concerns regarding due, unpaid, and

owed wages of the Fair Labor Standards Act." Doc. #1 at 11.

> FLSA provides that it is "unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [FLSA]." 29 U.S.C. §215(a)(3). FLSA retaliation claims are subject to the three-step burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 876 (2d Cir. 1988).

Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010).

Defendant moves for summary judgment on this claim, arguing that: (1) plaintiff is unable to establish a prima facie case of retaliation; (2) "her employment was terminated for a legitimate nonretaliatory reason[;]" and (3) the stated justification for her termination "cannot be shown to be pretextual." Doc. #59-2 at 36. The Court disagrees.

> [A] plaintiff alleging retaliation under FLSA must first establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.

Mullins, 626 F.3d at 53.

Defendant challenges only the third element of the prima facie case, arguing that "Plaintiff cannot establish a causal connection between her complaints about her clock-in times being rounded and her employment termination[.]" Doc. #59-2 at 36. Specifically, defendant contends that "[a]lthough Plaintiff complained to DiDominzio about her clock-in time being rounded

in the days prior to her employment termination, temporal
proximity alone is not enough to establish retaliatory motive."
Id. Defendant cites for this contention the decision in Smith v.
Da Ros, 777 F. Supp. 2d 340, 357 (D. Conn. 2011). The actual
language of that decision reads:

> Second Circuit precedent makes clear that the relevance
> of temporal proximity to the question of whether there
> is a "causal nexus" between a plaintiff's protected
> activity and the defendant's allegedly retaliatory
> action will depend on the facts and circumstances of
> each particular case. Thus, mere temporal proximity --
> even very close temporal proximity -- is not **always**
> sufficient to support an inference that the plaintiff's
> protected activity was a motivating factor in the
> defendant's adverse employment action.

Smith, 777 F. Supp. 2d 357 (citations removed) (emphasis added).

The undersigned agrees with Smith; temporal proximity is
not always sufficient at the prima facie stage. But as
previously noted, it can be. The Court may "exercise its
judgement about the permissible inferences that can be drawn
from temporal proximity in the context of particular cases."
Summa v. Hofstra Univ., 705 F.3d 115, 128 (2d Cir. 2009)
(citation and quotation marks omitted). Whether plaintiff's
termination just days after complaining about issues regarding
proper timekeeping was caused by her complaints or, as defendant
contends, by her conduct at the staff meeting, "raises a factual
issue that should be decided by a jury." Rasmy v. Marriott
Int'l, Inc., 952 F.3d 379, 392 (2d Cir. 2020); see also Jamilik

v. Yale Univ., 362 F. App'x 148, 151 (2d Cir. 2009) ("Given the temporal proximity between [plaintiff's] April 2006 complaint and the disciplinary warnings that led to her dismissal, we find that she has alleged sufficient facts to infer a causal connection between her protected activities and the alleged adverse actions, the only element of her prima facie case materially in dispute."); Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 196 (E.D.N.Y. 2015) ("[T]he temporal proximity of the [adverse action] and the [protected action] -- approximately three to four weeks -- is sufficiently close to support a prima facie causal connection[.]"). Because defendant challenges only this element of plaintiff's prima facie case, the Court finds that plaintiff has met the minimal hurdle of establishing a prima facie case of retaliation under the FLSA.

The burden thus shifts to defendant to set forth a legitimate, nonretaliatory, reason for terminating plaintiff. As described above, defendant has met that burden here.

Accordingly, the burden shifts back to plaintiff to show that defendant's stated justification for terminating her was pretextual.

As described above, supra, at 27-29, the facts surrounding the March 3, 2021, meeting -- which defendant relies upon as its primary justification for terminating plaintiff -- are highly disputed. In light of this dispute, plaintiff has raised a

triable issue of fact regarding whether defendant's stated
justification for terminating her employment was pretextual.
Because the Court finds that there is a genuine dispute of
material fact as to this issue, defendant's motion for summary
judgment on Count Four is denied.

### C.   Count Two: Common Law Wrongful Discharge

Defendant moves for summary judgment on Count Two,
plaintiff's common law wrongful discharge claim. <u>See</u> Doc. #59-2
at 29. To establish a claim for common law wrongful discharge, a
plaintiff must show that she is "<u>otherwise without remedy</u> and
that permitting the discharge to go unredressed would leave a
valuable social policy to go unvindicated." <u>Burnham v. Karl &
Gelb, P.C.</u>, 745 A.2d 178, 182 (Conn. 2000) (emphasis in
original).

Defendant argues that summary judgment should be granted as
to plaintiff's common law wrongful discharge claim because "she
has a statutory remedy ... for the retaliatory discharge she
alleges." Doc. #59-2 at 32. In response, plaintiff argues only
that "[u]nder Connecticut's rules of pleading, the plaintiff is
explicitly entitled to plead alternative and even inconsistent
causes of action." Doc. #65-2 at 21.

"A common-law approach to a claim of wrongful discharge is
barred as long as a [statutory] remedy has been made available
to address the particular public policy concerns[]" that form

the basis of plaintiff's theory of recovery. <u>Campbell v. Town of Plymouth</u>, 811 A.2d 243, 251 (Conn. App. 2002); <u>see also</u> <u>Mendez v. Utopia Home Care, Inc.</u>, No. CV-09-6006222, 2010 WL 4885347, at *3 (Conn. Super. Ct. Nov. 5, 2010) (rejecting argument that Section 31-51q and common law wrongful discharge claim may be pled in the alternative because "a statutory remedy exists for certain alleged conduct[,] preclud[ing] the plaintiff from stating a legally sufficient claim for common-law wrongful termination based on that conduct").

Such a remedy exists here. To the extent plaintiff contends that she was terminated for speaking out regarding defective testing and products, she has a statutory remedy under Section 31-51q. Similarly, the FLSA provides plaintiff with a statutory remedy for her claim that she was terminated for speaking out regarding wage and hour violations. Plaintiff does not advance any alternative theory of liability in support of her common law wrongful discharge claim. Plaintiff cannot maintain a claim for common law wrongful discharge where a statutory remedy is available for her claim. <u>See</u> <u>Dighello v. Thurston Foods, Inc.</u>, 307 F. Supp. 3d 5, 27–29 (D. Conn. 2018) (citations omitted) ("Defendant is correct that if Plaintiff's termination solely violated the public policy embodied in §31-51q (providing her with a statutory remedy), her common law discharge claim ... is precluded."). Summary judgment is therefore granted as to Count

Two.

**IV.** **<u>Conclusion</u>**

For the reasons stated, defendant's Motion for Summary
Judgment [**Doc. #59**] is **GRANTED** as to Count Two and **DENIED** as to
Count One and Count Four. Count Three is **WITHDRAWN.**

The parties shall file their Joint Trial Memorandum on or
before [30 days]. A separate Order will issue.

It is so ordered this 29th day of September, 2022, at
Bridgeport, Connecticut.

/s/
_____
HON. SARAH A. L. MERRIAM
UNITED STATES CIRCUIT JUDGE
Sitting by Designation
